# NOS. 12-13-00108-CR
# 12-13-00109-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *KRYSTLE ROSIE TANNER,*<br>*APPELLANT* | § | *APPEAL FROM THE 273RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SAN AUGUSTINE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Krystle Rosie Tanner appeals her convictions for reckless injury to a child (cause number 12-13-00108-CR) and kidnapping (cause number 12-13-00109-CR). She raises three issues on appeal. We affirm.

## BACKGROUND

A San Augustine County grand jury returned two indictments against Appellant for the offenses of injury to a child and kidnapping. Appellant's mother, Gloria Walker, was charged with the same offenses.

The initial events giving rise to Appellant's prosecution occurred in Houston, Texas. Appellant and Walker lived in an apartment complex where the child (M.M.) resided with his mother and father. Appellant and Walker had a close relationship with M.M.'s mother and often babysat M.M. In November 2004, M.M.'s mother went to Walker's apartment to bring M.M. home from babysitting, but he and Appellant were not there.

M.M.'s mother called the Houston Police Department. The investigating officers collected written statements from M.M.'s parents and other witnesses, and documentation from

Appellant's mother purportedly authorizing Appellant's possession of M.M. The case was investigated for more than one year, but M.M. was not found, and the case was closed.

In 2012, Appellant and her husband were being investigated by CPS in San Augustine County. CPS received allegations that there was an unknown child living in Appellant's house who was "being hid." Ultimately, that child was identified as M.M.—the child reported missing in Houston in 2004.

Appellant and Walker pleaded "not guilty" to the indictments, and a joint jury trial was held. The jury found Appellant guilty of reckless injury to a child (cause number 12-13-00108-CR) and kidnapping (cause number 12-13-00109-CR).[1] The jury assessed punishment for Appellant at eight years of imprisonment and no fine in each case. This appeal followed.

## LOST EVIDENCE

In her first issue, Appellant contends that the State violated her right to due process by failing to preserve evidence that "rendered it impossible for counsel to mount an effective defense." She contends that the State's failure to preserve evidence (i.e., the Houston Police Department's inability to find its original case file) violated due process under **Brady v. Maryland**, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and **Pena v. State**, 226 S.W.3d 634, 651 (Tex. App.—Waco 2007), *rev'd on other grounds*, 285 S.W.3d 459, 465 (Tex. Crim. App. 2009).

### Applicable Law

The state has a constitutional duty under both the United States and Texas constitutions to disclose evidence favorable to the defendant. *See* **Brady**, 373 U.S. at 87, 83 S. Ct. at 1196-97; **Wyatt v. State**, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); **Thomas v. State**, 841 S.W.2d 399, 402 (Tex. Crim. App. 1992) (en banc). To find reversible error on a **Brady** claim, a defendant must show that (1) the state failed to disclose evidence, (2) the withheld evidence is favorable to her, and (3) the evidence is material. *See* **Pena v. State**, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011).

But when the issue involves the state's failure to preserve evidence that may have been useful to the appellant, we apply a different test from that used in a typical **Brady** analysis. *See*

---

[1] In that trial, Gloria Walker was found guilty of injury to a child and kidnapping. Walker appealed her convictions, and this court affirmed. *See* **Walker v. State**, Nos. 12-13-00076-CR, 12-13-00077-CR, 2014 WL 357193 (Tex. App.—Tyler Jan. 31, 2014, pet. struck).

*Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010) (citations omitted). When "potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988); *Swearingen v. State*, 303 S.W.3d 728, 734 (Tex. Crim. App. 2010). Absent a showing of bad faith, the state's failure to preserve potentially useful evidence does not violate due process. *Id.*; *Ex parte Brandley*, 781 S.W.2d 886, 894 (Tex. Crim. App. 1989) (en banc).

Bad faith is more than simply being aware that one's action or inaction could result in the loss of something that is recognized to be evidence. *Ex parte Napper*, 322 S.W.3d at 238. Bad faith cannot be established by showing that evidence was destroyed without thought, or destroyed due to common practice, or because there was an unreasonable belief that proper procedure was being followed. *See id.* There must be some sort of improper motive, i.e., personal animus against the defendant or desire to prevent the defendant from obtaining useful evidence. *Id.*

## Discussion

The prosecution provided Appellant a copy of the offense report prepared by the Houston Police Department (HPD) memorializing the investigation of M.M.'s disappearance. The offense report was archived in a computerized system, but the physical case file could not be found. The file "should have remained in the juvenile division" of the HPD, but no explanation could be given as to its whereabouts. Ursula Williams, an HPD staff attorney, testified that an investigative file likely exists for this case, "everything that can reasonably be done to find this file has been done," and the file is "lost."

The archived offense report indicates that documents obtained by investigators were placed in the file and included two photographs of Krystle; a written statement by Katherine Morris (transcribed in the offense report); M.M.'s birth certificate; one VHC-C tape (possibly containing a picture of M.M.); Krystle's attendance record at Wheatley High School (transcribed in the offense report); copies of letters alleged to be from a notebook in which M.M.'s mother had started to write a power of attorney giving M.M. to Appellant; a letter from "A.S. Shields;" a letter from "her daughter" (a letter either from Walker or Tanner); a notarized statement by M.M.'s mother that "she took the baby to [Appellant] on 11/16/0[4] and went to get the baby on 11/17/04, to find them gone"; and a medical examiner's report relating to the death of one of

3

M.M.'s siblings from natural causes. Also included in the file were voicemail messages by M.M.'s parents that had been transcribed into the offense report.

The record does not establish that the HPD acted in bad faith when it failed to preserve the physical case file. Appellant argues that no showing of bad faith is required because the written statement, the notebook paper with the power of attorney, and voicemail recordings were all useful "impeachment evidence" and not "merely potentially useful." Appellant nevertheless argues that bad faith is shown by the HPD's failure to list M.M. on the missing persons database and by a notation contained in the offense report stating, "[T]his case does not appear to be an abduction, but some kind of problem between acquaintances over this child's custody." Although this statement may serve as the basis for failing to place M.M. on the missing person's database, it does not show bad faith in the case file's destruction or misplacement.

We agree that the items contained in the case file could have been potentially exculpatory and used for impeachment.[2] *See Ex parte Brandley*, 781 S.W.2d at 894. However, the record in this case shows that the prosecution turned over all of the evidence it had in its possession, and does not show that the HPD's failure to preserve the evidence was due to bad faith. *See Swearingen*, 303 S.W.3d at 734; *Ex parte Napper*, 322 S.W.3d at 229, 238. Accordingly, we overrule Appellant's first issue.

DISQUALIFICATION OF DEFENSE WITNESS

In her second issue, Appellant contends that the trial court abused its discretion when it excluded testimony from her aunt, Francesca Jenkins.

**Standard of Review and Applicable Law**

Texas Rule of Evidence 614 provides that, at the request of a party, the court shall order "witnesses excluded so that they cannot hear the testimony of other witnesses." TEX. R. EVID. 614. This is called "the Rule." *Routier v. State*, 112 S.W.3d 554, 590 (Tex. Crim. App. 2003). The Rule is designed to prevent witnesses from altering their testimony, consciously or not, based on testimony from other witnesses. *See id.*

Disqualification of defense witnesses for violation of the Rule must be viewed in light of the defendant's right to call witnesses on her behalf. *Davis v. State*, 872 S.W.2d 743, 745 (Tex.

---

[2] The physical case file was not Appellant's sole source for impeachment in this case. The archived offense report and testimony from HPD officers served to discredit testimony from M.M.'s mother that she did not authorize Appellant to take M.M.

Crim. App. 1994) (en banc). We apply a two part test to determine whether the trial court abused its discretion by prohibiting a witness from testifying in violation of the Rule. *See Routier*, 112 S.W.3d at 590; *Davis*, 827 S.W.2d at 746.

First, if the Rule was violated and the witness was disqualified, we must determine whether there were "particular circumstances, other than the mere fact of the violation, [that] would tend to show the defendant or [her] counsel consented, procured or otherwise had knowledge of the witness's presence in the courtroom, together with knowledge of the content of that witness's testimony[.]" *Routier*, 112 S.W.3d at 590 (citing *Webb v. State*, 766 S.W.2d 236, 244 (Tex. Crim. App. 1989)). If no particular circumstances existed to justify the disqualification, our second step is to determine whether the excluded testimony was crucial to the defense. *Routier*, 112 S.W.3d at 590. A trial court abuses its discretion when no circumstances justified the witness's disqualification and her testimony was crucial to the defense. *See id.*

**Discussion**

Prior to trial, Appellant's attorney invoked the Rule and the trial court admonished the witnesses accordingly. When Appellant called Francesca Jenkins to testify, the State objected because she was present during the previous day's testimony. It is undisputed that Jenkins was in the courtroom during the testimony of Timothy Taylor, Appellant's husband, and was therefore in violation of the Rule.

Jenkins testified that nobody had spoken with her about possibly testifying, and that Appellant did not know she had been in the courtroom until "after it was over." Jenkins explained that it was not until after she had heard Taylor's testimony that she approached Appellant's attorney and told him that she wanted to testify because "some of the stuff [she] heard was not true." Ultimately, the trial court disqualified Jenkins as a witness.

During Appellant's offer of proof, Jenkins testified that when she and Appellant's father went to Cleveland to "pick[] up" Appellant from Walker's house in 2004, she saw M.M., whom Appellant identified as her "little brother." Jenkins next saw M.M. in 2006 or 2007, when she went to Austin to visit Appellant's sister. Jenkins related that she never saw Walker at the house when she was there, but she saw M.M. Jenkins testified that the last time she saw M.M. was in 2011,

when Ms. Gloria [Walker] was supposedly brought [M.M.] to San Augustine. I didn't see her bring him. I just saw him and I asked, you know, I saw him, I was like, "how he get up here?" And they explained to me that Ms. Gloria [Walker] had brought him. And after a while, you know, he had—he wasn't going to school with the other kids. And I started asking Krystle. "Krystle, why he not going to school, you know. He need to be in school."

And I was telling her she could get in trouble for not sending him to school, and she explained to me that she didn't have any information to put him in school. She tried to put him in school, but she needed shot records and stuff like that. She explained to me that she asked her mom to give her—send her shot records and paperwork on him so she could put him in school. And her mom never sent it. And after a couple of weeks of her asking, her mama told her to bring him back.

I came home one day, he wasn't there. I lived with [Krystle's father] in 2009 and 2010, as well as Krystle, and [M.M.] was not there.

I've been knowing Krystle these whole eight years and she's been living in San Augustine and M.M. has not been there with her. And that's why I wanted to tell you to—to tell you guys. Because he ain't been with her these eight years.

The record does not show that Appellant or her attorney had knowledge of Jenkins's presence in the courtroom. The record also shows that Appellant's attorney was unaware of the content of Jenkins's testimony. If Jenkins's testimony is true, Appellant knew that Jenkins was a potential witness, but apparently failed to inform her attorney. Because Appellant's attorney did not know that Jenkins was a potential witness, he could not have known that Jenkins was subject to the Rule. Therefore, he would not have known to inform her that she could not be present during other witnesses' testimony.

Assuming without deciding that the circumstances did not justify Jenkins's disqualification, we nevertheless conclude that the trial court did not abuse its discretion because Jenkins's testimony was not crucial to Appellant's defense. *See id.* In fact, Jenkins's testimony shows that Appellant was involved in M.M.'s kidnapping and injury in some manner—even if her involvement was not until 2011 when M.M. was eight years old and not enrolled in school. Consequently, we overrule Appellant's second issue.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In her third issue, Appellant contends that she received ineffective assistance of counsel and asks this court to grant a new trial.

**Standard of Review**

It is well settled that an accused has the right to effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674 (1984). The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*, 466 U.S. at 686, 104 S. Ct. 2064. We follow the standard set forth in *Strickland* to determine whether counsel was ineffective. *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (en banc).

To prevail on an ineffective assistance of counsel claim, an appellant must prove by a preponderance of the evidence (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999). The first prong of the test requires a showing that counsel made errors so serious that counsel was not functioning as the counsel required by the Sixth Amendment, and that counsel's representation fell below an objective standard of reasonableness. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000) (en banc). The second prong requires a showing that counsel's errors were so serious as to deprive the appellant of a fair trial. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Simply put, the appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Tong*, 25 S.W.3d at 712; *Thompson*, 9 S.W.3d at 812. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Tong*, 25 S.W.3d at 712. If both prongs of the *Strickland* test are not satisfied, we cannot conclude that the trial results were unreliable. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

Judicial review of an ineffectiveness claim is highly deferential. *See Thompson*, 9 S.W.3d at 813. In conducting this review, we presume that counsel's conduct fell within the wide range of reasonable professional assistance. *See id.* at 813-14. The appellant has the burden of rebutting this presumption by presenting evidence illustrating why her trial counsel did what he did. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (en banc). An appellant cannot meet this burden if the record does not affirmatively support the claim. *See Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as

7

ineffective." *Id.* at 593. If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Id.*

Courts review the totality of the evidence when evaluating an appellant's claim of ineffective assistance of counsel. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010). Absent a properly developed record, an ineffective assistance of counsel claim must usually be denied as speculative. *See Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002).

## Applicable Law

A criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance of counsel. *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex. Crim. App. 1980) (en banc). Counsel also has the responsibility to seek out and interview potential witnesses, and failure to do so is to be ineffective where the result is that any viable defense available to the accused is not advanced. *Ex parte Ybarra*, 629 S.W.2d 943, 946, 948 (Tex. Crim. App. 1982) (en banc) ("[A]n attorney has a professional duty to present all available testimony and other evidence to support the defense of his client.").

When an appellant claims ineffective counsel for failing to call or subpoena witnesses at the guilt-innocence and punishment stages of trial, there must be a showing that such witnesses were available and that the appellant would have benefitted from their testimony. *Perez*, 310 S.W.3d at 894 (citing *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) (en banc).

When counsel does not object to hearsay evidence and the record does not provide any reference to explain why counsel chose not to object or failed to object, the appellate court should be especially hesitant to declare counsel ineffective. *See Thompson*, 9 S.W.3d at 814. If there is at least a possibility that counsel's conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief. *See Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007).

## Discussion

Appellant argues that counsel was ineffective because he (1) failed to interview and investigate potential witnesses, (2) called only one witness, (3) failed to subpoena Fernando Morin (M.M.'s biological father) as a witness, (4) failed to file a motion to sever, (5) failed to make a *Batson*[3] challenge, and (6) never made a hearsay objection throughout the entire trial.[4]

---

[3] *See generally Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

The record before us is silent about trial counsel's knowledge of potential witnesses and his underlying trial strategy. The record shows that trial counsel was unaware that Francesca Jenkins had knowledge pertaining to the lack of contact Appellant had with M.M., but his lack of knowledge regarding Jenkins could have been due to Appellant's failure to advise him of Jenkins's potential as a witness. However, trial counsel's calling of only one witness during Appellant's case-in-chief, when viewed in light of the fact that he failed to subpoena Fernando Morin, tends to suggest that he may not have presented all available testimony to support Appellant's defense. *See Ex parte Ybarra*, 629 S.W.2d at 948. But a review of the following discourse also suggests that counsel's failure to call Fernando Morin was based on trial strategy.

> Trial Counsel: Okay. Judge, now, I have another witness, Fernando Morin, they're not going to call.
>
> Prosecutor: No.
>
> Trial Counsel: Now, we can subpoena him, but we're kind of running out of time. It's close to noon and he's here. Why would it not be economical just to allow us to call him and –
>
> Prosecutor: Well, we're not—we're—we've already—we're releasing him, too. You haven't subpoenaed him yet, so—
>
> Trial Counsel: No. We certainly haven't had the time.
>
> Prosecutor: We're releasing him.
>
> Trial Counsel: Okay.
>
> Prosecutor: We're releasing Fernando as well, Your Honor.
>
> The Court: Okay.
>
> Trial Counsel: And we'll *more than likely* be subpoenaing Fernando.
>
> Trial Court: Okay.

(emphasis added). Other than Fernando Morin and Francesca Jenkins, Appellant does not identify, nor does the record reflect, any other witnesses that were available and beneficial to Appellant's defense. *See Perez*, 310 S.W.3d at 894.

---

[4] Appellant contends that counsel was ineffective for failing to file a motion to sever. However, the supplemental clerk's record shows that trial counsel filed a motion to sever that was denied.

Appellant argues that counsel was ineffective because there were "over [sixty-one] possible hearsay objections that were not made[,] not counting the references to the Houston [offense report], which trial counsel apparently made a strategic decision to not object to it[]s admittance." We have reviewed the particular instances cited in Appellant's brief, many of which include statements Appellant made to Gary Cunningham, the chief deputy for the San Augustine County Sheriff's Office. However, we note that some of the hearsay included statements not made by Appellant.[5]

> Cunningham: Well, I—I learned a number of things, and I found Ms. Boyer to be quite pleasant, forthright in her responses to me, not to appear to be evasive in any manner. But Ms. Boyer reported that an unidentified—an unidentified bi-racial child who was known by various names as, Quan, Jacoby, Dwight, and then a nickname of Dirty or Little Dirty, was in Krystle Tanner's—I'll—I'll call it custody, or possession, for some period of time, 2011. That the child had never attended school. That he was six to eight years of age. And that Boyer reported that Ms. Tanner had reported to her, had informed her, that quote, "A friend had given her the little boy."
>
> She reported that the child had resided at the Tanner's residence in San Augustine County from at least April the 17th to July 2011.
>
> . . . .
>
> Cunningham: I believe at one point much later in the investigation, they did talk to [Gloria Walker].
>
> Prosecutor: Did she know what happened to the child?
>
> Cunningham: No.
>
> . . . .
>
> Prosecutor: Now, at some point in time under—was—were the police ever told that—that this baby had been given to Krystle or Gloria?
>
> Cunningham: That was the initial contention by, I believe, Annie Rollins, and then later by Gloria Walker.
>
> Prosecutor: Okay. And did they ask [M.M.'s mother] about this?
>
> Cunningham: Yes, they did.
>
> Prosecutor: And what was her response?
>
> Cunningham: She absolutely denied giving any such written authorization or a letter to Krystle Tanner, Gloria Walker, or anyone else.

---

[5] We have omitted the hearsay statements made by Appellant or witnesses who testified during the guilt/innocence phase of trial.

. . . .

Prosecutor: Let's talk about that. What did Mr.—what did you learn from Mr. Tanner?

Cunningham: Of course, Mr. Tanner was quite concerned that his daughter had been arrested. She—he told me during the interview that—expressed that he didn't really know what was going on concerning this child, that Krystle Tanner had informed him—now his daughter had informed her father, Willie Tanner, that the child was actually her little brother that he—that she called her son.

Expressed to her father that the child, who we now know as [M.M.], was actually her little brother, that she was simply calling her son.

. . . .

Mr. Tanner informed me that his daughter had been residing with him for, quote, "about six or seven years" end quote.

. . . .

Mr. Tanner informed me, that his ex-wife, Gloria Walker, had brought the child now known as [M.M.] to his home sometime during the summer of 2011.

. . . .

Ms. Boyer conceded that Krystle Tanner had, in fact, been untruthful during my initial interview, during which Ms. Boyer was present. The noncustodial interview.

. . . .

Ms. Boyer expressed to me that Krystle Tanner had told her long ago that the child, that [M.M.'s] mother had given the child to Tanner and Gloria Walker because his mother had killed the child's father and was, quote, "going to jail," unquote.

. . . .

Prosecutor: As far as your investigation, Ms. Tanner brought the child here a week before Easter?

Cunningham: That is correct.

Prosecutor: You were told that by Krystle Tanner?

Cunningham: Yes, sir.

Prosecutor: Mr. Taylor [Krystle Tanner's husband]?

Cunningham: Yes, sir.

Prosecutor: And Willie [sic] Taylor?

Cunningham: Yes, sir.

The record is silent as to trial counsel's reasons for failing to object. *See **Thompson***, 9 S.W.3d at 814.

Lastly, Appellant contends that counsel was ineffective because he failed to raise any ***Batson*** challenge during jury selection. Again, the record is silent as to trial counsel's reasons for failing to raise a ***Batson*** challenge. *See **Jackson***, 877 S.W.2d at 771.

To summarize, Appellant has raised several concerns regarding trial counsel's representation. However, we are limited to the record before us. Appellant has not satisfied the first prong of ***Strickland*** because the record does not contain evidence concerning trial counsel's reasons for choosing the course he did. ***Id.***; ***Jackson***, 877 S.W.2d at 771. Therefore, we cannot conclude that the challenged conduct is so outrageous that "no competent attorney would have engaged in it." *See **Menfield***, 363 S.W.3d at 593. Moreover, Appellant has not shown that she was prejudiced by counsel's decisions. *See **Strickland***, 466 U.S. at 687, 104 S. Ct. at 2064; ***Menefield***, 363 S.W.3d at 592; ***Jackson***, 877 S.W.2d at 771; ***Batiste v. State***, 888 S.W.2d 9, 15-16 (Tex. Crim. App. 1994) ("The Supreme Court has given little indication exactly how ***Batson*** error renders the tribunal 'unfair' to the defendant."). Accordingly, we overrule Appellant's third issue.

### DISPOSITION

Having overruled each of Appellant's three issues, we ***affirm*** the judgment of the trial court.

**BRIAN HOYLE**
Justice

Opinion delivered July 31, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

JULY 31, 2014

NO. 12-13-00108-CR

**KRYSTLE ROSIE TANNER,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 273rd District Court

of San Augustine County, Texas (Tr.Ct.No. CR-12-8292)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

### JULY 31, 2014

### NO. 12-13-00109-CR

**KRYSTLE ROSIE TANNER,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 273rd District Court

of San Augustine County, Texas (Tr.Ct.No. CR-12-8293)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*